**LOCKHEED MARTIN CORPORATION,**
Plaintiff,

v.

**GALAXIS USA, LTD.**, a Delaware corporation and Bavaria–Hanseatic Holding GMBH f/k/a Galaxis Holding GMBH, a/k/a "The Galaxis Group"; Galaxis Vertriebsgesellschaft MBH, a German corporation; and Winfried Klimek, individually, Defendants.

No. 6:99–CV–1452ORL28JGG.

United States District Court,
M.D. Florida,
Orlando Division.

April 17, 2002.

Joseph E. Foster, Akerman, Senterfitt & Eidson, P.A., Orlando, FL, for plaintiff.

Thomas A. Hickey, Member, Eaton & Van Winkle, New York City, Winslow Davis Hawkins, III, Law Offices of Winslow D. Hawkes, III, P.A., West Palm Beach, FL, for defendants.

**ORDER**

ANTOON, District Judge.

This cause is before the Court on the following motions:

(1) Motion for Summary Judgment in Favor of Defendants Bavaria–Hanseatic Holding GMBH, Galaxis Vertriebsgesellschaft MBH, and Winfried Klimek (Doc. 93, filed November 30, 2001);

(2) Plaintiff/Counter–Defendant, Lockheed Martin Corporation's Motion for Summary Judgment on Amended Counterclaim III Brought By Defendant/Counter–Claimant Galaxis USA (Doc. 95, filed November 30, 2001);

(3) Plaintiff/Counter–Defendant, Lockheed Martin Corporation's Motion for Partial Summary Judgment on Contract Liability (Doc. 96, filed November 30, 2001); and

(4) Plaintiff Lockheed Martin Corporation's Motion for Partial Summary Judgment Against Defendant Winfried Klimek (Doc. 99, filed November 30, 2001).

These motions were referred by the undersigned District Judge to the assigned United States Magistrate Judge for the issuance of a Report and Recommendation. On January 24, 2002, the Magistrate Judge heard oral argument on the motions and issued oral rulings thereon. (Docs.138, 145).

The Magistrate Judge filed his Report and Recommendation on March 8, 2002 (Doc. 147). In that Report, the Magistrate Judge makes the following recommendations:

(1) that the Motion for Summary Judgment in Favor of Defendants Bavaria–Hanseatic Holding GMBH, Galaxis Vertriebsgesellschaft MBH, and Winfried Klimek (Doc. 93) be granted in part (as to Defendant Winfried Klimek) and denied in part (as to Defendants Bavaria–Hanseatic Holding GMBH and Galaxis Vertriebsgesellschaft);

(2) that Plaintiff/Counter–Defendant, Lockheed Martin Corporation's Motion for Summary Judgment on Amended Counterclaim III Brought By Defendant/Counter–Claimant Galaxis USA (Doc. 95) be granted and that Amended Counterclaim III be dismissed with prejudice;

(3) that Plaintiff/Counter–Defendant, Lockheed Martin Corporation's Motion for Partial Summary Judgment on Contract Liability (Doc. 96) be denied; and

(4) that Plaintiff Lockheed Martin Corporation's Motion for Partial Summary Judgment Against Defendant Winfried Klimek (Doc. 99) be denied.

Plaintiff Lockheed Martin Corporation ("Lockheed") has filed Lockheed Martin Corporation's Objections to Magistrate's Report and Recommendation (Doc. 151, filed March 18, 2002), and the Defendants have filed Defendants' Response to Lockheed Martin Corporation's Objections to Magistrate's Report and Recommendation

(Doc. 154, filed April 1, 2002). The defendants have not filed any objections to the Report.

After an independent de novo review of the record pertaining to those portions of the Report to which objections have been filed, the Court agrees with all but one of the conclusions and recommendations in the Report. The Court's conclusions and rulings with respect to each of the subject motions will be discussed in turn.

A. *Plaintiff/Counter–Defendant, Lockheed Martin Corporation's Motion for Summary Judgment on Amended Counterclaim III Brought By Defendant/Counter–Claimant Galaxis USA (Doc. 95)*

■ In the Report, the Magistrate Judge recommends that Lockheed's Motion for Summary Judgment on Amended Counterclaim III Brought By Defendant/Counter–Claimant Galaxis USA (Doc. 95) be granted because that claim—for negligence—is barred by the economic loss rule. galaxis USA has not filed an objection to this recommendation, and the Court agrees with the conclusion in the Report that the negligence claim in Amended Counterclaim III is barred by the economic loss rule. Accordingly, this motion (Doc. 95) shall be granted and this counterclaim shall be dismissed with prejudice.

B. *Motion for Summary Judgment in Favor of Defendants Bavaria–Hanseatic Holding GMBH, Galaxis Vertriebsgesellschaft MBH, and Winfried Klimek (Doc. 93) and Plaintiff Lockheed Martin Corporation's Motion for Partial Summary Judgment Against Defendant Winfried Klimek (Doc. 99)*

Both of these motions pertain to the alleged guaranty of galaxis USA's payment obligations under the production contract. In the Report, the Magistrate Judge recommends that Lockheed's motion (Doc. 99) be denied and that the Defendants' motion (Doc. 93) be granted as to Defendant Klimek and otherwise denied. Lockheed has objected to the recommendation that its motion (which pertains only to Klimek) be denied and that the Defendants' motion be granted as to Klimek; the Defendants have not objected to the recommendation that their motion be denied as to Defendants Bavaria–Hanseatic Holding GMBH and Galaxis Vertriebsgesellschaft MBH.

The Report concludes, in discussing these two motions, that Defendant Klimek "did not sign the guaranty in a personal capacity." (Doc. 147 at 44). The Report acknowledges Florida case law holding that "an individual may be personally liable under a contract when he signs the contract on behalf of an entity which does not exist." (Doc. 147 at 41 (citing *Van D. Costas, Inc. v. Rosenberg*, 432 So.2d 656, 658–60 (Fla. 2d DCA 1983))). However, the Report concludes that Klimek did not sign the alleged guaranty on behalf of a nonexistent entity because even though "there is no separate legal entity known as 'galaxis Group' . . . everyone knew what 'galaxis Group' meant." (Doc. 147 at 41).

In its Objections to the Report, Lockheed argues that its motion for summary judgment against Klimek should be granted because there is no issue of fact remaining as to whether Klimek individually signed the guaranty. Alternatively, Lockheed asserts that the Defendants' motion as to Klimek should be denied because there is no record evidence that Lockheed knew what "galaxis Group" meant in July and August of 1999 as concluded in the Report.

Upon consideration, the Court concludes that a genuine issue of material fact remains regarding whether Lockheed knew the meaning of "galaxis Group" in July and August 1999 when the alleged guaranty documents were signed. The Court does not find that the record conclusively shows that Lockheed indeed had such knowledge.

*See Van D. Costas, Inc.*, 432 So.2d at 659 ("Of course, if the contracting party knows the identity of the principal for whom the agent purports to act, the principal is deemed to be disclosed. A dispute concerning such knowledge presents an issue of fact.") (citation omitted). Accordingly, Lockheed's motion (Doc. 99) shall be denied, and Defendants' motion (Doc. 93) shall be denied in its entirety.

C. *Plaintiff/Counter–Defendant, Lockheed Martin Corporation's Motion for Partial Summary Judgment on Contract Liability (Doc. 96)*

In the Report, the Magistrate Judge concluded—after assuming for summary judgment purposes that the scanners contained manufacturing defects—that Lockheed's Motion for Partial Summary Judgment on Contract Liability (Doc. 96) should be denied because of the existence of numerous remaining issues of material fact. In its Objections (Doc. 151), Lockheed argues that it is clear from the record that galaxis USA accepted over 1200 scanners and sold approximately 265 of those scanners to third parties in May 1999. Lockheed then notes that not until August 17, 1999 did galaxis USA order Lockheed to stop production and claim that ten scanners were defective. Lockheed claims that galaxis USA was obligated to pay for scanners once it accepted them and that any claimed defects were subject not to the withholding of payment but to the opportunity of Lockheed to repair or replace the defective unit(s) at its option. Lockheed thus argues that it is entitled to summary judgment on the issue of contract liability and that the only issue remaining for trial is damages.

In their Response to Lockheed's Objections (Doc. 154), Defendants contend that the scanners were not accepted as alleged by Lockheed and that even if some scanners had been accepted, such acceptance was revoked. Defendants contend that "galaxis USA never had a reasonable opportunity to inspect the units for conformity" and that as long as "the scanners remained in Lockheed Martin's possession, they could still be inspected and rejected." (Doc. 154 at 7, 8). Defendants contend that the scanners were ultimately rejected in the August 17, 1999 stop work order and notice of defects. Finally, Defendants argue that Lockheed failed to comply with the provision in the Memorandum of Agreement requiring ninety (90) days' notice of intent to terminate.

Upon consideration of Lockheed's objections and Defendants' response thereto, the Court agrees with the Magistrate Judge's conclusion that genuine issues of material fact remain regarding the issue of contract liability, including as to whether ceratin of the scanners were accepted. Of course, at trial Lockheed will be given an opportunity to prove its position that galaxis USA breached the production contract by failing to pay for scanners it accepted. Moreover, at trial Lockheed will have an opportunity to address the contention by Defendants in their response that Lockheed failed to comply with the ninety-day notice-of-termination provision in the Memorandum of Agreement and the effect of that provision on the claimed breaches of the production contract. At trial, the Court will take up these issues and others relating to the meaning of the production contract in the light of the parties' conduct and course of performance. Thus, Lockheed's Motion for Partial Summary Judgment on Contract Liability (Doc. 96) shall be denied.

*Conclusion*

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. The Motion for Summary Judgment in Favor of Defendants Bavaria–Hanseatic Holding GMBH, Galaxis Vertriebsgesells-

chaft MBH, and Winfried Klimek (Doc. 93, filed November 30, 2001) is **DENIED in all respects.**

2. Plaintiff/Counter–Defendant, Lockheed Martin Corporation's Motion for Summary Judgment on Amended Counterclaim III Brought By Defendant/Counter–Claimant Galaxis USA (Doc. 95, filed November 30, 2001) is **GRANTED**. Amended Counterclaim III Brought by Defendant/Counter–Claimant Galaxis USA for negligence (contained in Doc. 39, filed February 1, 2001) is hereby **DISMISSED with prejudice.**

3. Plaintiff/Counter–Defendant, Lockheed Martin Corporation's Motion for Partial Summary Judgment on Contract Liability (Doc. 96, filed November 30, 2001) is **DENIED.**

4. Plaintiff Lockheed Martin Corporation's Motion for Partial Summary Judgment Against Defendant Winfried Klimek (Doc. 99, filed November 30, 2001) is **DENIED.**

5. The Court has noted Lockheed's objection to the authenticity of Exhibit "C" to the Affidavit of Winfried Klimek. Because that document does not pertain to a recommendation as to which objections were filed, the Court has not considered it in making the instant rulings and makes no determination at this time as to the authenticity of that document.

6. The Court has noted Lockheed's objection to the finding of fact in the Report that Exhibit Number 54 in Lockheed's Appendix (Doc. 98) "attached a proposed formal amendment to the BOA which, among other things, would have expanded the parties to the BOA to include Bavaria–Hanseatic." (Doc. 147 at 28). Although the Court concludes that there was a pro-

posed formal amendment to Lockheed's July 8, 1999, letter, the Court makes no ruling at this time as to whether that proposed amendment, if adopted, would have added Bavaria–Hanseatic as a party to the BOA.

## Report And Recommendation

GLAZEBROOK, United States Magistrate Judge.

TO THE UNITED STATES DISTRICT COURT

**THIS CAUSE** came on for hearing on January 24, 2002 on four pending motions for summary judgment filed by the parties. Those motions are:

1.) Plaintiff, Lockheed Martin Corporation's ("Lockheed Martin"), Motion for Partial Summary Judgment on Contract Liability against Defendant, galaxis USA, Ltd. ("galaxis USA"), Docket No. 96;

2.) Lockheed Martin's Motion for Partial Summary Judgment against Defendant, Winfried Klimek ("Klimek"), Docket No. 99;

3.) Lockheed Martin's Motion for Summary Judgment on Amended Counterclaim III brought by Defendant/Counter-claimant galaxis USA, Docket No. 95; and

4.) Motion for Summary Judgment in Favor of three Defendants, Bavaria–Hanseatic Holding GmbH ("Bavaria–Hanseatic"), galaxis Vertriebsgesellschaft mbH ("galaxis Vertriebsgesellschaft"), and Winfried Klimek, (collectively "the Guarantor Defendants")[1], Docket No. 93.

## I. INTRODUCTION

This case involves a contract entered into between Lockheed Martin and galaxis USA, pursuant to which the parties undertook to make products known as Space

---

1. While the Court refers to the three defendants, Bavaria–Hanseatic, galaxis Vertriebsgesellschaft, and Klimek as the "Guarantor Defendants" it does so solely

for purposes of simplicity. The reference in no way constitutes a finding that the defendants are indeed Guarantors.

Scanners. Space Scanners are satellite tracking systems which lock onto television signals, and allow recreational boaters to watch television. galaxis USA ordered 8,000 Scanners which Lockheed Martin agreed to build. Lockheed Martin commenced this lawsuit against galaxis USA after Lockheed Martin built a portion of the 8,000 Scanners, and galaxis USA refused to pay for them. galaxis USA has alleged that the Scanners were defective in parts and assembly. Lockheed Martin sued galaxis USA for breach of contract. Lockheed Martin also sued galaxis Vertriebsgesellschaft, Bavaria–Hanseatic, and Klimek, alleging that they are guarantors of galaxis USA's payment obligation under the contract with Lockheed Martin. galaxis USA filed counterclaims against Lockheed Martin for breach of contract and negligence.

### A. *Lockheed Martin's Motions for Summary Judgment*

Lockheed Martin filed three motions on November 30, 2001. Docket Nos. 95, 96, and 99. First, in its Motion for Partial Summary Judgment on Contract Liability against galaxis USA, Lockheed Martin seeks the entry of summary judgment on the issue of galaxis USA's liability under the Production Contract. Docket No. 96. Second, Lockheed Martin's Motion for Partial Summary Judgment against Klimek relates to an alleged guaranty of galaxis USA's payment obligations under the

Production Contract. Docket No. 99. Specifically, Lockheed Martin claims that Klimek, in his individual capacity, guaranteed galaxis USA's payment obligation under the contract with Lockheed Martin.

Third, in its Motion for Summary Judgment on Amended Counterclaim III, Lockheed Martin claims that it its entitled to summary judgment because galaxis USA's negligence claim—that Lockheed Martin negligently performed its obligations under the Production Contract—is barred by the economic loss rule which prohibits tort recovery for contract losses. In support of its three motions, Lockheed Martin filed a Statement of Undisputed Facts (Docket No. 101), an Appendix consisting of excerpts from record evidence and pleadings (Docket No. 98), certain discovery (Docket No. 102), and the Affidavit of Stanford Haynes (Docket No. 100).

On December 14, 2001, galaxis USA filed its memoranda in opposition to the Motion for Partial Summary Judgment on Contract Liability and the Motion for Summary Judgment on Amended Counterclaim III. Docket Nos. 115, 114. The Guarantor Defendants filed their memorandum in opposition to the Motion for Partial Summary Judgment against Klimek on December 14, 2001. Docket No. 116. On December 14, 2001, all four Defendants filed a Statement of Material Facts Precluding Summary Judgment for Lockheed Martin (Docket No. 113).[2] The Guar-

---

**2.** Unlike Lockheed Martin's detailed Statement of Undisputed Facts, the Defendants' Statement of Disputed Facts amounted to no more than a simple recitation of eight issues. The Defendants' Statement fails to dispute or specifically challenge the detailed facts, which Lockheed Martin claims are undisputed. The Defendants' Statement also fails to provide citation to record evidence. **The Case Management Order requires a party to specifically challenge those facts a moving party claims to be undisputed.** *See* Case Management and Scheduling Order, Docket No. 26 at 4 ("Each party opposing a motion for summary judg-

ment ... shall include necessary affidavits and a concise statement of the material facts as to which the opposing party contends there exists a genuine issue for trial ... Material facts set forth in the statement required to be observed by the moving party will be deemed admitted for the purposes of the motion unless controverted by the opposing party's statement."). This requirement allows the Court to focus on and differentiate those facts which are undisputed, and those that are disputed. Because Defendants failed to comply with this requirement, Lockheed Martin's

antor Defendants also filed the Affidavits of Stanford Haynes, James H. Clingham, and Karsten Meetz and the Declarations of Robert Gross and Hans–Dietrich Hormann in support of their opposition to Lockheed Martin's motions. Docket Nos. 117, 120.

### B. *Guarantor Defendants' Motion for Summary Judgment*

On November 30, 2001, the Guarantor Defendants filed their Motion for Summary Judgment. Docket No. 93. Specifically, the Guarantor Defendants claim that, as a matter of law, they are not guarantors of galaxis USA's payment obligations under the Production Contract. Contemporaneous with their motion, the Guarantor Defendants filed a Notice of Determination of Foreign Law and a Joint Certificate of Good Faith Consultation, and facsimile copies of the Affidavit of Winfried Klimek and the Declaration of Hans–Dietrich Hormann. Docket Nos. 92 and 94. On December 4, 2001, the Guarantor Defendants filed the original Affidavit of Winfried Klimek and the original Declaration of Hans–Dietrich Hormann in support of their motion. Docket Nos. 104, 105. On December 19, 2001, Lockheed Martin filed its memorandum in opposition to the Guarantor Defendants' motion. Docket No. 119.

On January 7, 2002, the Honorable John Antoon II referred all four motions to the undersigned for preparation of a report and recommendation. Docket No. 124. This Court conducted a six-hour hearing on the motions on January 24, 2002. Docket Nos. 138, 145.

## II. *THE LAW*

### A. *Standard of Review*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, to-

gether with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits, and to move for summary judgment on the case as a whole or on any claim. *Id.* When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir.1989). The Eleventh Circuit has explained the reasonableness standard:

In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the

Statement of Undisputed Facts are deemed

admitted over Defendants objections. *Id.*

facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one. *WSB–TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir.1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau,* 835 F.2d 855, 856 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

### B. *Florida Contract and UCC Law*

■ Under Florida law, the elements of a contract are offer, acceptance, and consideration. *See Air Products and Chemicals, Inc. v. Louisiana Land Exploration Co.,* 806 F.2d 1524, 1529 (11th Cir. 1986). Where terms of an offer and acceptance conflict, the courts will discard conflicting terms, but uphold a contract under "terms of which the parties have agreed if those remaining terms and conditions suffice to support an intelligent meeting of the minds." *See Eastern Cement v. Halliburton Co.,* 600 So.2d 469, 471 (Fla.App.4th D.C.A.1992).

■ It is well settled that the actual language used in the contract is the "best evidence of the intent of the parties and, thus, the plain meaning of that language controls." *See Rose v. M/V "GULF STREAM FALCON",* 186 F.3d 1345, 1350 (11th Cir.1999); *see also American Med. Int'l, Inc. v. Scheller,* 462 So.2d 1, 7 (Fla. App.4th D.C.A.1984) (stating that where a contract is clear and unambiguous and does not involve any absurdities or contradictions, it is the best evidence of the intent to the parties, and its meaning and legal effect are questions of law for determination by the court alone). Where the terms of an offer and acceptance conflict, however, the courts will discard conflicting terms, but uphold a contract under "terms of which the parties have agreed if those remaining terms and conditions suffice to support an intelligent meeting of the minds." *See Eastern Cement v. Halliburton Co.,* 600 So.2d 469, 471 (Fla.App.4th D.C.A.1992). Florida law recognizes the creation of a valid and enforceable contract when a party clearly communicates assent, even when that assent contemplates the future execution of a contract that is ultimately never executed. *Terra Group, Inc. v. Sandefur Management, Inc.,* 527 So.2d 849, 849–50 (Fla.App.5th D.C.A.1988)

■ Issues of contract interpretation are generally questions of law and, thus, properly resolved on summary judgment. *See Lawyers Title Ins. Corp. v. JDC (America) Corp.,* 52 F.3d 1575, 1580 (11th Cir.1995). However, the existence of a contract is a question of fact to be determined by consideration of all the facts and circumstances. *Master Palletizer Systems, Inc. v. T.S. Ragsdale Co.,* 725 F.Supp. 1525, 1531 (D.Colo.1989); *Green v. City of Hamilton, Housing Authority,* 937 F.2d 1561, 1566 (11th Cir.1991) ("allegations and affidavits raise genuine issues of fact regarding the existence of an enforce-

able contract for "permanent" employment under Alabama law"); *Consolo v. A.M.K. Corp.*, 344 So.2d 1285, (Fla.App.3rd D.C.A. 1977) (finding that summary judgment was precluded by existence of material issues of fact related to questions of whether contract existed between parties and whether various conditions precedent attached to negotiations were to be fulfilled as a prerequisite to the existence of the contract itself or were to be fulfilled merely as a prerequisite to the performance of the contract).

### 1. *Sales of Goods*

■ In this case, the Production Contract involves a sale of goods. Article 2 of the Florida Uniform Commercial Code ("the Code") applies. *See* Fla. Stat. § 672.102 (2001). Where a sales contract contains several open terms, the contract does not necessarily fail for indefiniteness, because such open terms may be supplemented by the UCC's "gap-filler" provisions. Under the Code "it is the obligation of the seller to transfer and deliver and the obligation of the buyer to accept and pay in accordance with the contract." Fla. Stat. § 672.301 (2001). A buyer's failure to pay for goods "accepted" constitutes a breach of a sales contract. *See* Fla. Stat. § 672.607(1) ("The buyer must pay at the contract price for any goods accepted."); *see also* Fla. Stat. § 672.703 (providing for seller's remedies upon a buyer's failure to make payment due on or before delivery).

Section 672.606 governs what constitutes acceptance of goods by a buyer. Under § 672.606, acceptance occurs when the buyer:

(a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that the buyer will take or retain them in spite of their nonconformity; or

(b) Fails to make an effective rejection (s.672.602(1)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) Does any act inconsistent with the seller's ownership.

Fla. Stat. § 672.606(1).

As to goods that are accepted, Fla. Stat. § 672.607 provides that:

(1) The buyer must pay at the contract rate for any goods accepted.

(2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this chapter for nonconformity.

(3) Where a tender has been accepted:

(a) The buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; and

(b) If the claim is one for infringement or the like (s.672.312(3)) and the buyer is sued as a result of such a breach he or she must so notify the seller within a reasonable time after he or she receives notice of the litigation or be barred from any remedy over for liability established by the litigation.

(4) The burden is on the buyer to establish any breach with respect to the goods accepted.

(5) Where the buyer is sued for breach of a warranty or other obligation for which his or her seller is answerable over:

(a) The buyer may give his or her seller written notice of the litigation. If the notice states that the seller may

come in and defend and that if the seller does not do so he or she will be bound in any action against him or her by his or her buyer by any determination of fact common to the two litigations, then unless the seller after seasonable receipt of the notice does come in and defend he or she is so bound.

(b) If the claim is one for infringement or the like (s.672.312(3)) the original seller may demand in writing that his or her buyer turn over to him or her control of the litigation including settlement or else be barred from any remedy over and if he or she also agrees to bear all expense and to satisfy any adverse judgment, then unless the buyer after seasonable receipt of the demand does turn over control the buyer is so barred.

(6) The provisions of subsections (3), (4) and (5) apply to any obligation of a buyer to hold the seller harmless against infringement or the like (s.672.312(3)).

Section 672.608 establishes when a buyer may revoke acceptance in whole or in part:

(1) The buyer may revoke her or his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to her or him if she or he has accepted it:

(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) Without discovery of such nonconformity if her or his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if she or he had rejected them.

 Under Florida law, "[w]here an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for breach." *Hospital Mortgage Group v. First Prudential Development Corp.*, 411 So.2d 181, 182 (Fla.1982). Whenever one party to a contract, where the contract is still executory, directs the other party not to proceed further with performance of the contract, the former has breached the contract and the latter may bring an action for damages for the breach of the contract. *See Poinsettia Dairy Products v. Wessel Co.*, 123 Fla. 120, 166 So. 306, 309 (1936); *Southern Crane Rentals, Inc. v. City of Gainesville*, 429 So.2d 771, 773 (Fla. App.1st D.C.A.1983) (a party's unilateral cancellation of a contract, after months of delaying performance by the other party, constituted an anticipatory repudiation).

### 2. *A Guaranty Contract*

 A guaranty is a collateral promise to answer for the debt or obligation of another. *Federal Deposit Insurance Corp. v. University Anclote, Inc.*, 764 F.2d 804, 806 (11th Cir.1985). Under Florida law, rules applicable to contracts generally apply to guaranty contracts. *Warner v. Caldwell*, 354 So.2d 91, 96 (Fla. App.3d D.C.A.1977). As noted above, the elements of a contract are offer, acceptance, and consideration. *See Air Products and Chemicals, Inc. v. Louisiana Land Exploration Co.*, 806 F.2d 1524, 1529 (11th Cir.1986).

■ A guaranty, like other contracts, requires consideration. Consideration to support an enforceable guaranty exists when a party forbears from enforcing its legal rights. *See Bara v. Jones,* 400 So.2d 88, 89 (Fla.App.4th D.C.A.1981) ("It is fundamental in the law of contracts that forbearance to sue on a debt, when the forbearance is bargained for, is good consideration for the promise of a third person, even though the claim is not asserted against the third person and the forbearance was of no advantage to him.").

## C. *Economic Loss Doctrine*

■ Under Florida law, "contract principles are more appropriate than tort principles to resolve purely economic claims." *Airport Rent–A–Car v. Prevost Car. Inc.,* 660 So.2d 628 (Fla.1995); *Florida Power & Light Co. v. Westinghouse Elec. Corp.,* 510 So.2d 899, 900 (Fla.1987). Florida courts apply the economic loss rule to prevent tort recovery "when damages flow from a breach of contract unless the tort is independent of the breach of contract." *Brass v. NCR Corp.,* 826 F.Supp. 1427, 1428 (S.D.Fla.1993).

■ The Florida Supreme Court has held that claims are barred by the economic loss rule if claims are factually "interwoven" with the breach of contract claim. *Florida College of Osteopathic Med., Inc. v. Dean Witter Reynolds, Inc.,* 982 F.Supp. 862, 862 (M.D.Fla.1997) (citing *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So.2d 1238 (Fla.1996)). It is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such breach can constitute negligence. *Serina v. Albertsons's Inc.,* 744 F.Supp. 1113, 1115 (M.D.Fla. 1990); *Electronic Sec. Sys. Corp. v. Southern Bell Tel. & Tel. Co.,* 482 So.2d 518, 519 (Fla.App.3d D.C.A.1986).

## III. *APPLICATION*

### A. *Undisputed Facts*

#### 1. *The Parties*

Plaintiff, Lockheed Martin Corporation, is a Maryland corporation, with its principal place of business in Maryland. Defendant, galaxis USA, Ltd., is a Delaware corporation with its principal place of business in New Jersey. Defendant galaxis Vertriebsgesellschaft mbH, is a German corporation with its principal place of business in Germany. *See* Appendix No. 1 at ¶ 3. Prior to January, 1999, galaxis Vertriebsgesellschaft was a wholly-owned subsidiary of Bavaria–Hanseatic Holding GmbH. *See* Appendix No. 3 at 8. In August 1999, the shares of galaxis Vertriebsgesellschaft were sold to Comet Equity GmbH. *Id.* galaxis Vertriebsgesellschaft has since been known as Comet Vertriebsgesellschaft. *Id.*

Defendant Bavaria–Hanseatic Holding GmbH, f/k/a galaxis Holding GmbH is a German corporation with its principal business in Germany. *See* Appendix No. 5 at ¶ 4. The "galaxis Group", which Lockheed Martin initially named as a Defendant, is not, and never has been, an actual entity. However, at the January 24, 2002 hearing, the parties agreed that the "galaxis Group" is an informal name applied to the combination of Bavaria–Hanseatic Holding GmbH, galaxis Vertriebsgesellschaft, and galaxis USA, Ltd. *See* January 24, 2000 Hearing Transcript, Docket No. 145 at 22—4.

Defendant Winfried Klimek is a citizen and resident of Germany. *See* Appendix No. 6 at ¶ 5. Klimek is or has been affiliated with all of the Defendant entities. *See* Appendix No. 7 at 11. Specifically, from June 1992 through June 1995, and from December 1997 through April 2000, Klimek had authority to bind galaxis Vertriebsgesellschaft with his signature alone.

*Id.* From June 1996 through the present, Klimek has served as Chairman of the Board of galaxis USA. *Id.* From May 16, 1995 through September 22, 1997, Klimek had authority to bind galaxis Holding. galaxis Holding changed its name to Bavaria–Hanseatic Holding in January 1999. *Id.*

James Clingham, not a party to this lawsuit, was the President of galaxis USA and was the corporation's Rule 30(b)(6) designee at galaxis USA's deposition of the company in October 2000. Stanford Haynes, not a named party, has prepared an affidavit filed with the court in this matter. *See* Appendix No. 8. Haynes worked for Lockheed Martin as an electrical engineer through February 1999. *Id.* at ¶ 4. From March 1999 through August 1999, Haynes worked for galaxis USA as its authorized representative, and was expressly authorized by galaxis USA to provide contract direction to Lockheed Martin. *Id.* at ¶¶ 3, 7.

### 2. *The Production Contract*

The Production Contract, described below, involved the sale of Space Scanners. Space Scanners are a product designed by galaxis USA so that recreational boaters may search for, and to lock onto, satellite television antenna signals by recreational boaters while their boats are docked. *See* Appendix 9A. Eight documents comprise a written agreement between Lockheed Martin and galaxis USA: [3]

 a. The Memorandum of Agreement between Lockheed Martin and galaxis

USA executed on February 3, 1998 (hereinafter referred to as "the MOA"). *See* Appendix No. 9A.

 b. The Basic Ordering Agreement between Lockheed Martin and galaxis USA, authorized by galaxis USA on April 6, 1998 and accepted by Lockheed Martin on May 13, 1998 (hereinafter referred to as "the BOA"). *See* Appendix No. 9B.

 c. Task Order No. 98–TO–001, authorized by galaxis USA on April 28, 1998 and accepted by Lockheed Martin on May 13, 1998, along with Exhibits A and B thereto (hereinafter referred to as "the Task Order"). *See* Appendix No. 9C.

 d. Letter from James Clingham to Brian O'Connor dated April 24, 1998 re: " 'Space Scanner' Trouble Shooting." *See* Appendix No. 9D (Composite).

 e. Letter from James Clingham to Brian O'Connor dated May 14, 1998 re: Amendment to LM–002. *See* Appendix No. 9D (Composite).

 f. Letter from Benjamin Holmes to James Clingham dated July 1, 1998 re: Purchase Order No. LM–002. *See* Appendix No. 9D (Composite).

 g. June 1998 Letter Amendment to Purchase Order LM–002. *See* Appendix No. 9D (Composite).

 h. Proprietary Information and Nondisclosure Agreement between Lock-

---

**3.** On August 23, 2000, Lockheed Martin propounded to galaxis USA its First Set of Interrogatories. Interrogatories 6 and 9 asked galaxis USA to identify all documents that galaxis USA contends evidence an agreement between it and Lockheed Martin. *See* Appendix No. 2. On April 19, 1999, Lockheed Martin filed a motion to compel answers to these interrogatories. *See* Appendix No. 4. In June, 2001, the parties agreed that galaxis

USA would amend its responses relating to the interrogatories, so as to identify those documents that constitute an agreement between the parties, and galaxis USA amended its response on July 24, 2001. *See* Appendix No. 9 and 67. On July 24, 2001, galaxis USA identified eight documents which constitute a written agreement between the parties.

heed Martin, galaxis USA, and FutureTrak International, Inc.

*See* Appendix No. 9E.

The parties and the Court refer to three of the above eight documents, the MOA, the BOA, and the Task Order (Items a—c above) as "the Production Contract." Items d—g above are referred to as "the Rework Contract," which Lockheed Martin claims is an entirely separate contract.[4] The Rework Contract is related to the Production Contract and forms part of the written agreement between Lockheed. Martin and galaxis USA. The remaining document, Item h above, governs the exchange of proprietary information during the course of the agreement.

The primary documents relevant to the Court's consideration of this motion are the MOA, the BOA, and the Task Order. On February 3, 1998, Lockheed Martin, as Seller, and galaxis USA, as Buyer, executed the Memorandum of Agreement ("MOA"). *See* Appendix No. 9A. The MOA identifies Lockheed Martin as the manufacturer of the Scanner. The MOA identifies galaxis USA as the designer of the Scanner. galaxis USA represents that galaxis has completed the design of a preprogrammable automatic satellite tracking system known as the Space Scanner. The MOA recognizes that Lockheed Martin would work on a "build to print" basis. The work would be performed by Lockheed Martin[5] as a "build to print" effort utilizing technical information including drawings, software, schematics, component layout, specifications and bills of material provided by galaxis.

The MOA charges galaxis USA with design responsibility. galaxis USA is responsible for the design performance to stated system requirements. The MOA contains a limited warranty by Lockheed Martin:

Each purchase order shall contain a mutually agreeable warranty for repair or replacement of workmanship defects in delivered scanners and ACUs. **galaxis** shall be responsible for the design performance to stated system requirements. The term of warranty shall be for twelve (12) month (sic) from date of delivery by [Lockheed Martin] **THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, APPLICABLE TO THE PRODUCTS**

**4.** In April, 1998—after the parties entered into the Production Contract but before production of the Space Scanners began thereunder—galaxis USA asked Lockheed Martin to assist with troubleshooting certain Space Scanners previously produced by a German company that were being returned by end users for failures in the field. On April 21, 1998, galaxis USA asked Lockheed Martin to provide a quote for its assistance with this troubleshooting task. *See* Appendix No. 14. On April 24, 1998, galaxis USA gave Lockheed Martin a $5,000 authorization to "test a representative sample ... collect data on whether the units pass/fail test ... troubleshoot the failed units ... determine the cause of failure ... and provide a summary report ..." *See* Appendix No. 15. galaxis USA indi-cated that all invoices on this project should reference "Purchase Order No. LM–002". *Id.* On May 14, 1998, galaxis USA amended Purchase Order LM–002 to add the task of reworking 450 failed Space Scanners and to increase the value of the Purchase Order by $45,000 for a total value of $50,000. *See* Appendix No. 16. The value of Purchase Order LM–002 was later increased to $105,000 by galaxis USA on June 22, 1998. *See* Appendix No. 17.

**5.** In the MOA, Lockheed Martin is referred to as "Ocala" because Lockheed Martin Corporation, through its Electronics & Missiles, Ocala Operations, entered into the Production Contract.

**OR SERVICES PROCURED UNDER THIS AGREEMENT.**

(Bold in Original). The provisions of the MOA were not to be changed or modified unless in writing by an authorized representative of each party.

In the Spring of 1998, the parties executed the Basic Ordering Agreement ("BOA"), with an effective date of March 5, 1998. *See* Appendix No. 9B. galaxis USA signed the BOA on April 6, 1998. Lockheed Martin signed the BOA on May 13, 1998. The BOA contemplated the issuance of Task Orders, but stated that *the BOA itself could only be modified by an amendment signed by an authorized representative of each party,* and not by Task Orders.

The BOA established a minimum order quantity of 8,500 Scanners through two specific tasks: 1.) the assembly of 500 units from "kits" to be furnished by galaxis (which never happened); and 2.) the assembly of 8,000 Scanners from materials Lockheed Martin would procure. The BOA reiterated that Lockheed Martin agreed to engage in a "build to print" effort and would adhere to commercial standards and practices utilizing technical information provided by galaxis. The BOA also set forth "General Terms and Conditions Applicable to Task Orders" ("Terms and Conditions") which included:

a. Lockheed Martin would make no changes to the galaxis USA design of the Scanner. (Terms and Conditions, 1(d));

b. All galaxis change orders were to be in writing, and would provide for equitable adjustments in the price and/or delivery schedule (Terms and Conditions, 8);

c. Payment was to be made net thirty (30) days (Terms and Conditions, 10);

d. Paragraph 13 of the Terms and Conditions allocated design responsibility to galaxis, and contained Lock-

heed Martin's disclaimer of certain warranty obligations under the UCC: Lockheed Martin warrants that products delivered hereunder shall be free from defects in materials and workmanship. *The Buyer is responsible for product design performance* and interface and installation into the intended next higher assembly. *If any nonconformity within the scope of this warranty appears within twelve (12) months after delivery as related to products, Buyer shall promptly notify Lockheed Martin and Buyer shall return nonconforming product to Lockheed Martin. Lockheed Martin shall correct such nonconformity by repair or replacement at its option,* and shall ship the corrected product to Buyer within the continental USA. Shipments outside the continental USA shall be the responsibility of Buyer. *This warranty does not apply to material furnished by Buyer or to failure of a component specified by Buyer to perform its intended function, which in each case, shall be replaced or repaired at Buyer's expense.* Except as stated herein, THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, APPLICABLE TO THE PRODUCTS OR SERVICES PROCURED UNDER THIS ORDER.

(underlining added).

On April 28, 1998, galaxis USA issued Task Order No. 98–TO–001 (the "Task Order"). *See* Appendix No. 9C. In the Task Order, galaxis USA ordered two items: 1.) Item 001 was for Lockheed Martin to assemble 500 Scanners from kits to be pro-

vided by galaxis; and 2.) Item 002 was for Lockheed Martin to assemble 8,000 Scanners at a unit price of $594.31, for a total purchase price of $4,754,480. *Id.* On February 1, 1999, galaxis USA deleted Item 001 from the Task Order. *See* Appendix No. 30. Therefore, the only relevant item in the MOA, the BOA, and the Task Order became Item 002, relating to the production of 8,000 Space Scanners from parts authorized by galaxis and procured by Lockheed Martin. Under the Production Contract, a minimum quantity of 8,000 Space Scanners was to be purchased at a rate of 1,000 per month beginning on July 12, 1998. *See* Appendix No. 9B, 9C. Under this schedule, the 8,000 Scanners would have been purchased by February 1999. *Id.*

### 3. *The Rework Contract*

In April 1998, before Lockheed Martin began work on the Production Contract, galaxis USA asked Lockheed Martin for help with Space Scanners that had been built in Germany and sold by galaxis USA to FutureTrak International, Inc. ("FutureTrak"). *See* Appendix No. 14. FutureTrak, in turn, had sold these German-built Scanners to end users, and a significant number of these end users had returned the German-built Scanners claiming them to be defective. *Id.*

To troubleshoot and rework these German-built Scanners that FutureTrak had returned to galaxis USA, Lockheed Martin and galaxis USA entered into a Purchase Order LM–002. *See* Appendix No. 15. Under Purchase Order LM–002, Lockheed Martin agreed to test the German-built unit to identify the cause of failure, communicate its findings to galaxis USA, and rework the German-built units in accordance with galaxis USA's directions. *Id.* In return, galaxis USA agreed to pay Lockheed Martin on a "time and material" basis, whereby Lockheed Martin was compensated for the materials it supplied, and pensated for the materials it supplied, and

was paid on an hourly rate for the labor it performed. *Id.;* Appendix No. 16.

The rework effort under Purchase Order LM–002 continued from April 1998 until September 22, 1998, when galaxis USA directed Lockheed Martin to "stand down" on all rework efforts under Purchase Order LM–002. *See* Appendix No. 18. In a letter dated, November 20, 1998, Lockheed Martin acknowledged galaxis USA's direction to cease its rework efforts under Purchase Order LM–002. *See* Appendix No. 21. After the rework effort, the parties turned their attention to the Production Contract.

### 4. *Lockheed Martin's Performance Under the Production Contract*

Stanford Haynes was a former engineer with Lockheed Martin joined galaxis USA in March 1999. *See* Appendix No. 8 at ¶ 3–4. Haynes was employed by Lockheed Martin at the time the parties entered into the Production Contract. *Id.* at ¶ 6. Haynes was galaxis USA's delegated representative on the Production Contract and was authorized to provide contract direction to Lockheed Martin. *Id.* at ¶ 7. According to. Haynes, who worked at the Lockheed Martin facility where the Scanners were built and who observed Lockheed Martin's assembly of the Scanners, Lockheed Martin built the Space Scanners properly, met commercial standards in doing so, and used parts approved in advance by galaxis USA *Id.* at ¶ 8, 9.

On October 8, 1998, Lockheed Martin advised galaxis USA that it needed direction on a number of production issues, including software. Lockheed Martin advised that galaxis had not yet provided Lockheed Martin with software, which was jeopardizing Lockheed Martin's ability to procure certain parts, specifically, rotor cards and ACUs. *See* Appendix No. 19. On November 17, 1998, galaxis USA re-

sponded to Lockheed Martin's inquiries. Among other things, galaxis USA advised that the ACU software should be delivered to Lockheed Martin by November 20, 1998. galaxis USA also confirmed its request for ten units "without fulfillment (that is, ACU, Kugel and cable only)."[6] Acknowledging that the software delays had impacted the original schedule, galaxis USA requested that Lockheed Martin provide it with a revised schedule. *See* Appendix No. 20.

On December 1, 1998, galaxis USA instructed Lockheed Martin to build the Scanners with dual-cables instead of single cables, changing its earlier authorization to use single cables. *See* Appendix No. 22. galaxis USA also directed Lockheed Martin to install fans in every ACU to address a heating problem it had determined was affecting the performance of the ACU. *Id.*

On December 3, 1998, galaxis USA again instructed Lockheed Martin to build the Space Scanners with dual-cables, rather than single-cables. *See* Appendix No. 23. galaxis USA also instructed Lockheed Martin not to build more than ten units: "[U]ntil beta tests can be performed on these first 10 units by FutureTrak, Germany and others, [galaxis USA][7] cannot allow production to proceed." *Id.* In the same letter, galaxis USA gave Lockheed Martin further instructions on the installation of fans in the ACU. *Id.*

On December 10, 1998, Lockheed Martin outlined key issues that remained unresolved, all dealing with the design of the Scanners. These unresolved design issues included:

a. Inadequate or defective software,

b. The cost and scheduling impacts of galaxis design modifications relating to the software, ACU heating, and dual vs. single-cables.

c. Beta Testing—through which galaxis would test the first ten units produced by Lockheed Martin, evaluate the then-current design configuration, and thereafter instruct Lockheed Martin to proceed with production of the remaining 8,000 units.

*See* Appendix No. 24.

Nevertheless, Lockheed Martin re-affirmed its readiness to proceed with production once these design issues were resolved. *Id.* galaxis USA responded on December 11, 1998 with the following directions:

a. Employ Software Version 1.17A, or advise what Lockheed Martin recommends.

b. Change the update file for Rotor default values to .56 horizontal and vertical.

c. Await software from CMC rather than use Software 4.4.

d. Install cable in a certain way for the initial 10 units, then modify the 10 units with a 390 OHM resistor replacing the 75 other resistor, and to report back to galaxis USA.

*See* Appendix No. 25.

On December 17, 1998, galaxis USA instructed Lockheed Martin to ship all but 50 reworked units under the Rework Contract to Germany. *See* Appendix No. 26.

---

**6.** "Fulfillment" refers to certain packaging-related obligations Lockheed Martin had to a third party FutureTrak, under a separate contract. Lockheed Martin's related "Fulfillment Contract" with FutureTrak contemplated that galaxis would convey Space Scanners back to Lockheed Martin after Lockheed Martin had delivered them to galaxis under the Task Order. Lockheed Martin would then place items like remote controls and instructions into a FutureTrak box, along with the ACU, Kugel and cables. All this would be done "in-place" at Lockheed Martin's Ocala facility.

**7.** This letter was authored by Nicholas Paraskevopoulos who, at the time, worked for galaxis USA as an engineer.

Five days later, however, galaxis USA revoked this direction, because a third-party, First Capital Services, had asserted a claim to these units under a factoring agreement. *See* Appendix No. 28.

On January 20, 1999, galaxis USA and Lockheed Martin held a Space Scanner status meeting in Ocala, Florida. On January 25, 1999, Lockheed Martin recapped the meeting in a letter, listing the following direction and action items which were discussed and agreed to at the meeting:

a. Lockheed Martin would stop work on developing a proposal for 3,000 additional Track on the Fly Scanners[8] until after galaxis resolved software and hardware design issues;

b. galaxis would provide a status of reconciliation plan for $64,000 due for reworking non-Lockheed built Scanners under Purchase Order LM–002, the Rework Contract;

c.1 galaxis would provide written direction regarding the 500 "kits" to be assembled under Item 001 of the Task Order;

c.2. galaxis would also provide direction regarding the galaxis "hold" on production of the 8,000 Scanners under Item 002 of the Task Order;

d. galaxis would rescind the requested Engineering Change for the installation of a cooling fan in the ACU;

e. All galaxis correspondence would be directed through the contracts department of Lockheed Martin's Ocala facility, and all galaxis-directed change requests would be made in writing;

f. galaxis would summarize an anticipated January 29, 1999 meeting between galaxis and FutureTrak.

*See* Appendix No. 29. Lockheed Martin expressly stated that it was not waiving any of its rights under the BOA or the Task Order. *Id.*

On February 1, 1999, galaxis USA responded, about the same meeting. In that letter, galaxis USA: deleted the requirement to assemble 500 "kitted" units, under Item 001 of the Task Order, with the price for that task to be reduced to the costs associated with the receipt of materials and preparation of a summary of materials received; rescinded its previous direction to install a fan in every ACU; and requested that Lockheed Martin provide a proposal showing schedule and cost impacts resulting from the directions outlined therein. *See* Appendix No. 30.

On the same day—February 1, 1999—galaxis acknowledged open invoices on the Rework Contract and its obligations to pay. Specifically, Clingham advised:

Thanks for the continued patience of everyone at Lockheed. I again reiterate that galaxis acknowledges its rework obligations and the open invoices. I advised Brian O'Connor on Friday, while discussing other matters, that galaxis will make the payment to Lockheed during this week, when I am back in Princeton on Thursday.

*See* Appendix No. 31. Clingham also advised that a solution to its software issues was close at hand:

We had a very successful meeting with FutureTrak, cleared up all open issues, will be working out a solution to the software issues within two weeks and will turn on full production of the 8,000 pieces right thereafter. The cooperation between FutureTrak and galaxis should remove any concerns that Lockheed has over moving product. FutureTrak has a

---

**8.** "Track on the Fly Scanners" were anticipated as the next generation of Scanners that could lock onto satellite TV signals even while a boat was moving. Under the Production Contract at issue, Lockheed Martin agreed to build the earlier version of Space Scanners, that would operate only while a boat was docked.

good sales plan that should have us on schedule quickly.

On February 4, 1999, galaxis USA sent an e-mail to Winfried Klimek, advising that galaxis USA owed Lockheed Martin $64,000 on the Rework Contract, and that Lockheed Martin had already incurred over $1,200,000 in vendor costs on the Production Contract. *See* Appendix No. 32. On February 5, 1999, galaxis USA advised Lockheed Martin that it was sending two payments, in the amounts of $38,800 and $25,500, for amounts due on the Rework Contract. *See* Appendix No. 33.

On February 8, 1999, Lockheed Martin advised that a simple e-mail or fax letter direction from galaxis USA was all it needed to proceed with the building of the 8,000 units (the Production Contract), so long as galaxis rescinded its "stop work" direction. *See* Appendix No. 34. Lockheed Martin inquired whether galaxis USA intended to authorize the building of 8,000, or a lesser quantity. *Id.* galaxis USA requested a schedule that would allow it to adjust delivery of the 8,000 units after the first 2,000 were built. *Id.*

On February 23, 1999, galaxis USA added to its February 22 requests the tasks of (a) turning on the recall of the eleven units and (b) scheduling for immediate production of the first 50 units, in batches of 25 and 25. galaxis USA further requested a "running rate for the ramp up of full production." *See* Appendix No. 36. In March, 1999, galaxis USA hired Haynes to oversee the Production Contract at the Lockheed Martin facility in Ocala, Florida where the Space Scanners were built. *See* Appendix No. 8 at ¶ 3, 7–8. Prior to working for galaxis USA, Haynes had worked as an engineer for Lockheed Martin. *Id.* at ¶ 4–5. Haynes was galaxis USA's designated representative on the Production Contract and was expressly authorized by galaxis USA to provide contract direction to Lockheed Martin. *Id.* at ¶ 7.

On March 23, 1999, galaxis USA confirmed its oral order that Lockheed Martin build ten more Scanners to the same configurations as the first 50. *See* Appendix No. 37. galaxis USA advised that this was an official order, and that the purchase order should be amended accordingly. *Id.* In that e-mail, galaxis USA mentioned that it was experiencing intermittent failure in two Space Scanners which would be worked on offline by the team from FutureTrak, galaxis USA, and Lockheed. *Id.*

On the same day, March 23, 1999, Lockheed Martin responded to galaxis USA's request for ten units, advising that it would make every effort to deliver within the requested 24 hours. *See* Appendix No. 38. Further, Lockheed Martin indicated: "Please acknowledge that the directed production 'stops and starts' and Engineering Support are inconsistent with the requirements of the Production contract . . . ." *Id.* Lockheed Martin further advised that the stops and starts and extra-contractual engineering support might result in added costs to the Production Contract. *Id.*

On March 24, 1999, galaxis USA acknowledged that the delays could impact cost, but advised "I do not want to get into making 200 units until we are all agreed on the fix for the field failures we saw on the first fifty." *Id.* galaxis USA advised that the production schedule should be turned "in the next couple of days." *Id.*

On May 3, 1999, Lockheed Martin delivered to galaxis USA 76 Space Scanners assembled by Lockheed Martin bearing Serial Nos. 1010080 through 1010155. *See* Appendix No. 8C. On May 5, 1999, Lockheed Martin requested confirmation that (a) the proposed schedule forwarded on April 23 was acceptable and (b) Haynes was delegated as galaxis USA's representative with authority to provide contractual

direction to Lockheed Martin. *See* Appendix Nos. 40, 8A. On the same day, galaxis USA confirmed both. *Id.* On May 6, 1999, Lockheed Martin delivered to galaxis ten Space Scanners assembled by Lockheed Martin, bearing Serial Nos. 1010156 through 1010165. *See* Appendix No. 8D.

On May 10, 1999, Lockheed Martin delivered to galaxis USA 114 Space Scanners assembled by Lockheed Martin bearing Serial Nos. 1010166 through 1010264 and 1010266 through 1010279. *See* Appendix No. 8E. On May 17, 1999, Lockheed Martin delivered to galaxis USA 206 Space Scanners assembled by Lockheed Martin, bearing Serial Nos. 1010265 and 1010280 through 1010485. *See* Appendix No. 8F. On the same day, Clingham forwarded to Klimek Lockheed Martin's outstanding Invoice No. 049–177 totaling $134,252. *See* Appendix No. 41. Clingham advised: "We are committed to pay the attached invoice no later than 31 May 1999. Can you advise?" *Id.*

On May 19, 1999, Thomas Kreuels of galaxis Vertriebsgesellschaft e-mailed inquiries to galaxis USA. *See* Appendix No. 42. Among other things, he inquired: "What are the warranty/guarantee terms we have with LM? Who had to do what and pay for what should a unit in Europe go defective?" On the same day, Clingham responded:

This unit is a galaxis design. The Contract with Lockheed is a build to design contract. Once we accept the units they are our problem unless we can show there is a manufacturing problem. That is why I have tried to get the guys in Frank's group to understand and sign off on the drawings and to make changes to the drawings they see necessary. We have paid Lockheed no money nor have we ever had a Contract with them to redesign the units. As to defective parts, they are responsible. The smart thing for us to do, once you determine your requirements is to put a parts and repair depot in Lubeck, so we can take units back from the field that are defective and fix them ourselves. We can then return in bulk if defective manufacturing is involved and file claims for defective manufacturing if necessary. Let us hope that will not be a problem.

*See* Appendix No. 43.

On May 27, 1999, galaxis USA advised Lockheed Martin to "hold production for now until we work out the details of the open technical issues." *See* Appendix No. 44. On June 10, 1999, Clingham again inquired of Klimek about outstanding invoice costs totaling $131,175.15. *See* Appendix No. 45. He advised: "With regard to Lockheed Martin there is no question that we owe them over 100K... I thought you and I agreed on that. When can that be paid?" *Id.*

On June 10, 1999, galaxis USA requested that Lockheed Martin perform a rework on 200 rotor cards per Haynes's e-mail dated June 9, 1999. *See* Appendix No. 46. On June 15, 1999, Clingham faxed to Wolfgang Hopp of galaxis Vertriebsgesellschaft Lockheed Martin's outstanding invoice totaling $162,144.58. *See* Appendix No. 47. He advised: "Nothing is going to happen with regards to building other products until we pay the invoice which was due on May 31st, 1999... They will not restart the line without payment." *Id.*

On June 17, 1999, Lockheed Martin acknowledged galaxis USA's June 10 request to rework the rotor cards and advised that it was proceeding with the request. *See* Appendix No. 48. Lockheed Martin further inquired whether it should implement the same rotor card changes on the remainder of the 8,000 units. *Id.* On the same day, galaxis USA responded in the affirmative, and advised that it would accept delivery of 1,200 units per month from June through December, 1999. *Id.*

On June 18, 1999, Lockheed Martin delivered to galaxis USA 119 Space Scanners assembled by Lockheed Martin, bearing Serial Nos. 1010486 through 1010588, and 1010605 through 1010620. *See* Appendix No. 8G. On June 22, 1999, Lockheed Martin sent a letter to Klimek directly about galaxis USA's failure to pay its outstanding invoice totaling $134,252, despite repeated assurances of payment by Clingham. *See* Appendix No. 49. Lockheed Martin further advised that it was poised to complete delivery of 200 units incorporating the revised rotor card design, and had resumed production operations for the remaining 7,196 units. *Id.* Lockheed Martin reaffirmed its intent to honor its commitment to complete production by the end of September 1999. *Id.* Lockheed Martin closed with an invitation to discuss payment issues at a meeting among the principals of the companies. *Id.*

On June 24, 1999, Lockheed Martin submitted to galaxis USA a claim of $102,190 for out-of-scope work performed on Item 002. *See* Appendix No. 50. On June 29, 1999, Clingham faxed to Klimek a draft response to Lockheed Martin's June 22 letter, advising: "These are the changes which I made. It looks good, BUT I do believe that you have to pay the USD 134,252 now." *See* Appendix No. 51.

On June 30, 1999, Lockheed Martin advised Klimek of its disappointment that it had not received a response to its June 22 letter. *See* Appendix No. 52. Lockheed Martin further advised that 200 additional units had been built and were awaiting shipment. *Id.* On the same day, Klimek responded to Lockheed Martin's June 22 letter, acknowledging that Lockheed Martin was owed $134,252. *See* Appendix No. 53. On July 8, 1999, Lockheed Martin delivered to galaxis USA 166 Space Scanners assembled by Lockheed Martin, bearing Serial Nos. 1010589 through 1010604, and 1010621 through 1010770. *See* Appen-

dix No. 8H. On the same day, Lockheed Martin delivered an additional 90 Space Scanners assembled by Lockheed Martin, bearing Serial Nos. 1010771 through 1010860. *See* Appendix No. 81. Also in July, 1999, Lockheed Martin delivered to galaxis USA an additional 45 Space Scanners, assembled by Lockheed Martin, bearing Serial Nos. 1010861 through 1010904, and one unit bearing the Serial No. 1010445. *See Appendix No. 8J.*

On July 8, 1999, Lockheed Martin sent a letter to Klimek and galaxis USA, referencing a series of letters and meetings between the parties regarding the Production Contract. *See* Appendix No. 54. Lockheed Martin attached a proposed formal amendment to the BOA which, among other things, would have expanded the parties to the BOA to include Bavaria–Hanseatic. *Id.* The BOA Amendment presented ten proposed action items. *Id.* Among the ten action items, provision 1 would have provided for payment by galaxis USA of invoice no. 49177 in the amount of $134,252 by July 30, 1999; provision 2 would have provided for the costs of a stop work order of May 27, 1999; provision 5 would have provided for re-work of certain scanners which had been delivered to galaxis USA and remained at Lockheed's Ocala facility; provision 6 would have provided a cost proposal for change in rotor cards for units already in the field; provision 8 would have had galaxis USA pay for the cost of money for a revised shipment plan; provision 9 would have required galaxis USA to secure an irrevocable letter of credit for payment of monthly deliveries; and, provision 10 would have had galaxis Vertriebsgesellschaft unconditionally and irrevocably guarantee all of galaxis USA's obligations to Lockheed. Provision 10 read:

> galaxis Vertriebsgesellschaft mbh hereby unconditionally and irrevocably guarantees as its own independent obligation

to Lockheed Martin Corporation the due and punctual performance of all obligations of galaxis USA, Ltd including payment under the BOA. The Guaranty shall continue in force and effect until all the obligations of galaxis USA, Ltd under the BOA have been satisfactorily performed, and may not be modified except in writing.

*See* Appendix No. 54. At the end of the proposed BOA Amendment, Lockheed Martin included language that would have bound signing parties to provisions 1—10, as written: "[t]he parties signatures acknowledge the acceptance of *all* actions identified and their incorporation under the changes clause of the Basic Ordering Agreement." *Id.* (emphasis added). Bavaria–Hanseatic, galaxis Vertriebsgesellschaft, galaxis USA, and Klimek never signed Lockheed Martin's proposed amendment to the BOA.

The parties continued with negotiations regarding the July 8, 1999 proposal. On July 15, 1999, Lockheed Martin, galaxis USA, and Klimek met in Germany in an attempt to resolve the issues identified. On July 16, 1999, Clingham and Klimek sent a letter to Lockheed Martin memorializing the July 15 meeting in Germany. The July 16, 1999 letter listed the proposed action items and, identified the status of each item. *See* Appendix No. 55. For instance, item 8 was tabled until an August meeting, and no agreement had yet been reached as to a Letter of Credit. As to item/provision 10, the proposed guaranty, Clingham (galaxis USA) and Klimek (galaxis Group) advised: "By signature below, the galaxis Group accepts Provision 10." *Id.* galaxis USA and Klimek further agreed to pay certain invoices: Invoice No. 49177 for $134,252 by July 30, 1999; to pay $22,183 for rotor card work by July 30, 1999; to pay $102,000 for units remaining in the field by July 30, 1999, with those units being recalled for rework to be invoiced separately. They further agreed

that 1,000 units would be shipped and billed in July and August, for a total of 2,000 units. *Id.*

Following its response to each of the outstanding issues and actions, the galaxis Group stated that: "[t]he galaxis Group appreciates the spirit of the meeting of July 15, 1999, and is encouraged that successful completion of the BOA would result. galaxis is prepared to sign any Amendment necessary to the BOA that generally reflects this response and the Meeting of July 15, 1999." Appendix No. 55.

On July 22, 1999, Lockheed Martin responded to Klimek's July 16, 1999 letter. *See* Appendix No. 56. Accordingly, Lockheed Martin cancelled four invoices totaling over $500,000 and issued new invoices for $22,183 and $112,346.80, due on or before July 30, 1999 per Klimek's July 16, 1999 letter. Lockheed Martin also noted the revised contract value of $5,132,707. *Id.* Additionally, Lockheed Martin stated that after the scheduled upcoming August 8, 1999 meeting, Lockheed Martin would prepare an amendment to the BOA to incorporate the agreements reached during the July 15 meeting, and the anticipated program resulting from the August 8 meeting. *Id.*

On July 26, 1999, Clingham forwarded Lockheed Martin's July 22 letter to Klimek, asking "Any information on Money Plan?" *See* Appendix No. 57. On August 2, 1999, in response to Lockheed Martin's inquiry about the status of payment per the July 16 letter agreement, Clingham acknowledged that payment was due:

I am afraid you will have to deal with Mr. Klimek directly in Lubeck. He has told me early last week that he still intended to pay the invoices. Since then he has not communicated with me, nor

do I have a copy of any payment transfers. I am in a terrible position here. *See* Appendix No. 58.

On August 2, 1999, Clingham advised Lockheed Martin that galaxis USA would pay the invoice as promised in the July 16 letter agreement signed by himself and Klimek. *See* Appendix No. 59. He further advised that Klimek was indisposed due to illness, and asked Lockheed Martin to direct all inquiries to Wolfgang Hopp, the chief financial officer for the company. *Id.* On the same day, Clingham further advised Lockheed Martin: "I was of the impression that galaxis would pay the invoices as promised in the Letter signed by Mr. Klimek and myself following the meeting with Phil Ciarlo and Bob Morin, dated July 16, 1999." *Id.*

On August 3, 1999, galaxis Vertriebsgesellschaft (and not galaxis USA) forwarded copies of checks reflecting payments in the amounts of $22,183 and $112,346.80. *See* Appendix No. 60. On August 10, 1999, Lockheed Martin acknowledged receipt of payment in the amount of $134,529.80, but advised that $134,252 for work performed under the Production Contract was still owing. *See* Appendix No. 61. Lockheed Martin requested that the payment be made by wire transfer by August 9, 1999. *Id.*

On August 5, 1999, Lockheed Martin delivered to galaxis USA 280 Space Scanners assembled by Lockheed Martin, bearing Serial Nos. 1010905 through 1011184. *See* Appendix No. 8K. The same day, Lockheed Martin delivered to galaxis USA one additional Scanner, bearing Serial No. 1011185. *See* Appendix No. 8L.

In a letter dated August 5, 1999, Lockheed Martin acknowledged receipt of three checks, but again advised that $134,252 was due for work performed under the Production Contract. *See* Appendix No. 62. Lockheed Martin requested that this payment be made by electronic transfer no

later than August 9, 1999. *Id.* In order to facilitate the resolution of the "remaining outstanding issues and actions," Lockheed Martin responded to issues relating to the July 16, 1999 letter. *Id.* Specifically, Lockheed Martin argued: "The contract clearly supports that galaxis USA, Ltd., bears total design responsibility for the design of the Space Scanner." *Id.* With respect to provision 10 (action item 10), Lockheed Martin formally noted and hurriedly "accepted" Klimek's "guaranty" in writing. *Id.* Following a response to each of the outstanding issues and actions, Lockheed Martin stated that:

> Following agreement on these issues and pursuant to your conclusion statement within your letter (ref.a), Lockheed Martin offers to prepare a formal contract modification for execution by all parties by 31 August 1999. Lockheed Martin remains committed to arrive at a mutually acceptable resolution of these issues and sincerely appreciates your efforts in this matter.

*See* Appendix No. 62.

On August 10, 1999, Lockheed Martin was advised that the three checks forwarded on August 3, 1999, were to be applied to the amount due of $134,252. *See* Appendix No. 63. On the same day, Lockheed Martin responded, advising that there was apparent confusion in galaxis USA's bookkeeping. *See* Appendix No. 64. Lockheed Martin again advised galaxis USA and Klimek that $134,252 was still owing to Lockheed Martin as of July 30, 1999, and requested that payment be made by August 11, 1999. *Id.*

On August 16, 1999, Lockheed Martin delivered to galaxis USA 153 Space Scanners assembled by Lockheed Martin, bearing Serial Nos. 1011186 through 1011338. *See* Appendix No. 8M. That very day, Clingham faxed a draft stop work letter to Klimek advising:

Dear Winni and team: here is a draft letter we could send to Lockheed. Please give me your changes, etc. I fashioned this from the material that Frank Bennett has sent. I do not believe we should be too detailed at this point.

*See* Appendix No. 65.

After analyzing ten units supplied to galaxis USA in Germany, on August 17, 1999 galaxis USA issued a Stop Work Request and Notice of Claim for Defective Parts and Workmanship ("Stop Work Letter"). *See* Appendix No. 66. Therein, galaxis USA ordered Lockheed Martin to stop work immediately, asserting that: 1.) Lockheed was aware of various issues concerning the design and manufacture of the space scanner and the significant rejection and failure rate reported by FutureTrak; 2.) galaxis USA had undertaken, through an outside expert, a complete mechanical analysis of ten units which revealed significant issues in the manufacture of the product as well as its quality, serviceability and reliability; 3.) six out of the ten Scanners failed when subjected to certain tests ("long-term test") and upon disassembling one Scanner, alleged defects were observed; 4.) no commercially reasonable or responsible long-term testing was done by Lockheed or the type of default/defects that were found by galaxis Germany would have been detected and corrected; and 5.) the parts selected by Lockheed did not result in parts that would fit for the intended purpose of the unit. *See* Appendix No. 67. galaxis USA did not return turn any of the ten tested Scanners to Lockheed Martin.

On August 19, 1999 Lockheed Martin responded. *See* Appendix No. 68. Lockheed Martin argues to galaxis USA that the Production Contract was "a build to print effort to commercial standards and practices utilizing technical information provided by galaxis." *Id.* Lockheed further advised:

That the Scanners built were contract compliant.

That there had been no galaxis warranty returns or repairs.

That the Production Contract contained no requirement that Lockheed Martin perform any type of reliability testing.

That it had performed in good faith.

That it had delivered 1,000 Scanners in July and had completed 475 against the 1,000 due to be delivered in August.

That it had incurred costs in excess of $4,200,000 in materials ordered and received to support the build of 8,000 units.

That its only outstanding obligation was to assemble the remaining Scanners and deliver them.

*Id.*

On August 23, 1999, Lockheed Martin advised galaxis USA that the parties had not agreed that Lockheed Martin would subject the Scanners to any endurance testing or "100% test." *See* Appendix No. 69. Taking the position that any such testing would be new in scope, Lockheed Martin inquired whether galaxis USA wanted Lockheed Martin to submit a proposal to incorporate such testing. *Id.*

On August 30, 1999, galaxis USA advised Lockheed Martin: that it was stopping payment on the three checks sent to Lockheed Martin on August 3, 1999; that no payment would be made until the parties reached "a general agreement about the quality"; and that it was sending back Lockheed Martin's invoice dated August 16, 1999 for $617,520 marked "not accepted." *See* Appendix No. 70. galaxis USA has not paid Lockheed Martin the purchase price under the Production Contract.

## B. *Contract Liability Analysis*

### 1. *The Parties' Positions*

In its Motion for Partial Summary Judgment on Contract Liability against galaxis USA, Lockheed Martin seeks the entry of summary judgment on the issue of galaxis USA's liability under the Production Contract. *See* Docket No. 96. According to Lockheed Martin, under the Production Contract, it was obligated to build 8,000 Space Scanners according to the design of galaxis USA and to commercial standards. Lockheed Martin claims that it warranted only that the Scanners it built would be free of workmanship defects and defects in parts not specified or approved by galaxis USA. According to Lockheed Martin, it had no design responsibility under the Production Contract. Additionally, if it built Scanners that were defective in workmanship or parts (not specified or approved by galaxis USA), Lockheed Martin was entitled to cure such defects by repair or replacement, at Lockheed Martin's option.

According to Lockheed Martin, it built and delivered approximately 1,200 Scanners pursuant to galaxis USA's design, and galaxis USA accepted those Scanners through its delegated representative, Stanford Haynes. Lockheed Martin claims that galaxis USA breached the Production Contract by refusing to pay for the Scanners. Lockheed Martin claims that it was ready, willing, and able to build the balance of the 8,000 Scanners (having purchased all the materials necessary to complete the order), but that galaxis USA anticipatorily breached the Production Contract by ordering Lockheed Martin to stop work in the middle of production—on August 17, 1999. galaxis USA ordered Lockheed Martin to stop work because it claims that ten of the 1,200 Scanners had been tested and found defective. galaxis did not return the Scanners for repair or replacement.

At the January 24, 2002 hearing, and solely for purposes of its motion for partial summary judgment, Lockheed Martin did not contend that the Scanners were free of manufacturing defects. Instead, Lockheed Martin contended that even if there were manufacturing defects, galaxis USA breached the Production Contract by failing to pay for the Scanners that it had "accepted". Lockheed Martin further contended that galaxis USA cannot prove compliance with the warranty provisions because galaxis USA failed to give timely and sufficient notice of defects and did not give Lockheed Martin an opportunity to cure the alleged defects in the Scanners.

Lockheed Martin further maintains that galaxis USA gave notice only of design defects, not manufacturing defects. Manufacturing defects are outside the scope of Lockheed Martin's responsibility under the Production Contract. Lockheed Martin also argues that galaxis USA's notice of any defective parts also falls outside Lockheed Martin's responsibility because galaxis USA specified or approved all of the parts used to build the Scanners.

In its opposition papers, galaxis USA maintains that Lockheed Martin agreed to much more than a "build to print effort"—that Lockheed Martin agreed to reverse engineer the Space Scanners using a German prototype. According to galaxis USA, to accomplish this task, Lockheed Martin made affirmative recommendations as to parts which galaxis USA relied on in approving the component parts used to build the Scanners. According to galaxis USA, Lockheed Martin produced Scanners with a level of manufacturing errors that were commercially unreasonable. Moreover, Lockheed Martin failed to perform its obligations under the Production Contract—namely, building the Scanners and making recommendations as to parts and

design modifications—in a reasonable and workmanlike manner.

As to Lockheed Martin's claim of breach, galaxis USA argued that several times during the parties' course of performance, galaxis USA ordered Lockheed Martin to stop work. According to galaxis USA, it was only when Lockheed Martin concluded that its own manufacturing and reverse engineering errors would be too costly to correct that it construed one of galaxis USA's stop work orders—the August 17, 1999 stop work letter—to be an anticipatory breach. Finally, galaxis USA argued that it refused to pay for the defective Scanners delivered by Lockheed Martin because Lockheed Martin had already breached the contract by failing to correct the defects in the Space Scanners. galaxis USA claims that Lockheed Martin's breach of the contract, claims relieved galaxis USA of its obligation to pay.

## 2. *Analysis*

■ Neither Lockheed Martin nor galaxis USA contends that the Court can, at this stage, determine whether there were manufacturing defects in the Scanners. Neither does Lockheed Martin argue that the record demonstrates no material issue of fact as to whether there were manufacturing defects.[9] Rather, Lockheed claims that, even assuming that there were manufacturing defects, it is nonetheless entitled to summary judgment on the issue of liability. Lockheed Martin is mistaken.

Drawing all inferences in favor of the non-movant, galaxis USA, the Court assumes that the Scanners contained manufacturing defects for the purpose of resolving Lockheed Martin's Motion for Partial Summary Judgment. Having fully considered the parties' arguments and the record, the Court finds that the following

issues of fact remain, among others, which preclude summary judgment: whether under the Production Contract Lockheed Martin has an obligation to use care in making recommendations relating to parts and modifications to galaxis USA; whether galaxis USA approved the parts used by Lockheed Martin to build the Scanners; if so, whether galaxis USA approved the parts pursuant to Lockheed Martin's recommendations; whether Lockheed Martin's delivery of the Space Scanners through galaxis USA's representative Haynes or otherwise, constitutes "acceptance of goods" under Florida's Uniform Commercial Code; whether any non-conformity within the scope of the warranty was discovered within 12 months after delivery; whether galaxis USA promptly notified Lockheed Martin of defects; whether galaxis USA's August 17, 1999 stop work order constituted an anticipatory repudiation of the Production Contract; whether galaxis USA's August 17, 1999 stop work order, which occurred after testing of the ten units in Germany, complied with the warranty contained in Provision 13 of the BOA; whether Lockheed Martin was responsible for the alleged failures listed in the stop work letter; whether Lockheed Martin was provided with an opportunity to cure any defects; whether Lockheed Martin met its contract obligations after notification of defects; whether Lockheed Martin breached the contract by failing to correct defects in the Scanners; whether galaxis USA owed money to Lockheed Martin under the contract; whether galaxis USA's refusal to pay Lockheed Martin constituted a breach of the production contract; and whether galaxis was justified in not paying Lockheed Martin, and was justified in ordering Lockheed Martin to stop work.

9. At the January 24, 2002 hearing, Lockheed Martin abandoned its earlier claim, for purposes of summary judgment only, that the alleged defects were design defects and not part-related defects. Docket No. 96 at 2.

Because genuine issues of material fact remain, Lockheed Martin's Motion for Partial Summary Judgment on Contract Liability against galaxis USA [Docket No. 96] should be **DENIED**.

## C. *The Guaranty Analysis*

### 1. *The Parties' Positions*

The Motion for Summary Judgment in Favor of the Guarantor Defendants [Docket No. 93] and Lockheed Martin's Motion for Partial Summary Judgment against Klimek [Docket No. 99] both relate to the alleged guaranty of galaxis USA's payment obligations under the Production Contract. In their motion for summary judgment, the Guarantor Defendants seek the entry of judgment in their favor.[10]

The Guarantor Defendants argue that there is no guaranty. Rather, Lockheed Martin seeks to enforce as a guaranty a mere proposal among several proposals and counter-proposals exchanged between the parties while negotiating a global, three-party, ten-point amendment to the BOA. Defendants further maintain that the parties contemplated that any such agreement could take the form of a written amendment to the BOA. The BOA expressly states "this BOA can only be modified by an amendment signed by authorized representatives of each party and not by individual task orders issued under it." Appendix 9B. The Guarantor Defendants argued that no such agreement or written amendment ever occurred. Thus, no guaranty contract was ever formed. Additionally, the Guarantor Defendants claim that no guaranty contract was formed because Lockheed Martin made a proposal as to ten items, only three of which were accept-

ed by the Defendants. Thus, the Guarantor Defendants maintain that their acceptance varied from Lockheed Martin's offer, making it a counter-proposal.

Finally, the Guarantor Defendants argue that there existed no consideration supporting a guaranty by galaxis Vertriebsgesellschaft and Bavaria–Hanseatic as the only possible consideration was an amendment to the BOA to which neither was a party. Klimek, they argue, should be dismissed from the lawsuit because all the correspondence relating to the purported guaranty reflects that Klimek signed in a representative capacity, not as an individual intending to bind himself personally.

In its opposition, Lockheed Martin maintains that the guaranty was not part of a larger, three-party agreement. Rather, it was a separate agreement that was in no way contingent upon an amendment to the Production Contract. Lockheed Martin argues that the guaranty is an "independent" obligation—independent in the sense that it is separate form any contemplated amendment to the BOA, as well as "independent" from the payment obligations of galaxis USA. According to Lockheed Martin, Lockheed Martin's guaranty proposal and Klimek's acceptance is evidence of mutual assent to a separate guaranty agreement. Lockheed Martin urges the Court to consider Defendants' acts of having galaxis Vertriebsgesellschaft send checks to Lockheed Martin as payment for work performed under the Production Contract as evidence that the Guarantor Defendants understood that a guaranty existed. Finally, as to the question of consideration, Lockheed Martin

---

**10.** In their motion, the Guarantor Defendants argued that German law applies to issues relating to the alleged guaranty because the guaranty, if any, was negotiated in Germany and signed by Klimek in Germany. Nonetheless, the motion cites to both Florida and German law. At the hearing on the motion, the Court noted that the forum selection clause in the contract chose Florida law, and the parties agreed that Florida law should apply.

**1342**

maintains that the guaranty was supported by adequate consideration, namely Lockheed Martin's forbearance from declaring galaxis USA in default for non-payment and suing for breach.

In response to the Guarantor Defendants' motion, as well as on Lockheed Martin's own Motion for Partial Summary Judgment against Klimek, Lockheed Martin takes the position that Klimek is personally liable on the guaranty because he signed Lockheed Martin's proposal using no qualifying language that he was signing on behalf of someone or some entity other than himself and, to the extent he signed on another's behalf, he signed on behalf of a non-existent entity. Lockheed Martin is wrong.

### 2. *Analysis*

 Under Florida law, an individual may be personally liable under a contract when he signs the contract on behalf of an entity which does not exist. *Van D. Costas, Inc. v. Rosenberg*, 432 So.2d 656, 658—60 (Fla.App.2d D.C.A.1983). Klimek, however, did not sign the July 16, 1999 proposed amendment to the BOA on behalf of an entity which does not exist. It is true that there is no separate legal entity known as "galaxis Group". Nevertheless, everyone knew what "galaxis Group" meant. The term "galaxis Group" meant the group of three legal entities: Bavaria–Hanseatic and its two wholly-owned subsidiaries. Klimek signed, not in his individual capacity, but rather on behalf of Bavaria–Hanseatic and its two wholly-owned subsidiaries, galaxis Vertriebsgesellschaft and galaxis USA. Klimek signed none of the contract documents in his personal capacity.

Obviously, galaxis USA cannot guarantee its own contract. The remaining question is whether galaxis Vertriebsgesellschaft and Bavaria–Hanseatic guaranteed an obligation of galaxis USA's. The circumstances, the facts, the signature lines, and the language of the contract documents are all important in determining whether an enforceable guaranty exists. Several issues of fact remain for trial with respect to the alleged guaranty.

 The first issue is whether the parties intended to form a guaranty contract at all absent full agreement on provisions 1—10. It is undisputed that there was never an agreement as to all of the material terms of the July 8, 1999 proposal. In their July 16, 1999 response, galaxis USA and galaxis Group expressed their willingness to agree to three, while expressing their unwillingness to agree to others, and leaving several items for further discussion. The terms of the July 16, 1999 response were not identical with the terms of the July 8, 1999 proposed BOA Amendment.

Provision 10, the guaranty provision, was one of the three items agreed upon by galaxis Group and galaxis USA. Indeed, in their July 16 response, Klimek (on behalf of the galaxis Group) and Clingham (on behalf of galaxis USA) stated that they "accepted" provision 10 by their "signatures below." Klimek and Clingham, however, also stated that they were prepared to sign any amendment to the BOA that reflected their response to items 1—10. Resolution of items 1 –10 apparently were anticipated. Indeed, the Guarantor Defendants claim that at the July 15, 1999 meeting in Germany, Clingham and Klimek "made it plain that galaxis/Comet would be willing to sign an amendment to the BOA that contained a guarantee by the entities, but only if the parties reached an agreement on all open points reference in Lockheed's July 8, 1999 Proposal including, among others, production issues, payment issues, and shipment issues." Docket No. 93, Klimek Aff., Ex. C.

Lockheed's own copy of the July 8, 1999 proposal, marked up by an unspecified Lockheed Martin representative at an unspecified time (perhaps the July 15, 1999 meeting date) supports galaxis USA's position. That copy indicates that there could be no acceptance of the "guaranty" item if the parties disagreed on the other items: "OK *if* you accept 1–9!" Docket No. 93, Klimek Aff., Ex. C. There is a fact issue as to whether the guaranty was contingent upon resolution of issues 1 through 9.

A second issue of fact also remains as to whether the parties intended to be bound only by a formal amendment to the BOA. In the August 5, 1999 letter, following provision 10, Lockheed Martin offers to prepare a formal contract modification for execution by all parties. This contemplates a further document following agreement on not one issue, but on "all these issues." It also contemplates a formal modification for execution not just by galaxis USA, but by *all* parties. Bavaria–Hanseatic was to be added as a party to the BOA. The references in the letters contemplating that the agreement would be reduced to writing as an amendment to the BOA, and the necessity of signing an amendment to the BOA, are additional aspects that give rise to a material issue of fact.

Moreover, this Court finds that Provision 10 is not clear. It is ambiguous as to the intent of the parties as to the formation of the guaranty contract. It is ambiguous as to whether any such contract would be a guaranty by galaxis Vertriebsgesellschaft only, or by Bavaria–Hanseatic and galaxis Vertriebsgesellschaft. Apparently, the only guarantee sought in Provision 10 was from galaxis Vertriebsgesellschaft and not its parent. This may be true even though the authorization signatures sought, and received, were not only from the President of galaxis USA, but from Klimek as Chairman, perhaps Joint Chairman, of Bavaria–Hanseatic. Indeed, Lockheed Martin's proposal was to amend the BOA to add Bavaria–Hanseatic, f/k/a/ galaxis Holding GMBH, as a party to the BOA, with galaxis Vertriebsgesellschaft as the guarantor.

Lockheed Martin eagerly read Klimek's letter dated July 16, 1999 (characterizing what had occurred at the July 15, 1999 meeting in Germany) as if the letter were separating the provision 10 guaranty from any consideration of provisions 1—9, and extending galaxis Group's guaranty unconditionally. Lockheed Martin, therefore, quickly drafted its August 5, 1999 response seeking to "lock in" an "understanding" highly favorable to Lockheed Martin, *i.e.*, that galaxis Group unconditionally guaranteed galaxis USA's obligations to Lockheed Martin. It may well be that Klimek and the galaxis Group wanted to and did agree at the July 15, 1999 meeting to provide a guaranty from the whole group. Such a guaranty might give Lockheed Martin confidence that all of the money of Bavaria–Hanseatic was standing behind the obligations of galaxis USA.[11] However, Lockheed Martin also may have "accepted" more than was actually offered and, thus, made a counteroffer. There remains a material issue of fact for trial.

The existence of remaining issues of fact as to the parties' intent to form a guaranty contract precludes the entry of summary judgment in favor of either Lockheed Martin or the Guarantor Defendants, with the exception of Klimek. As to Klimek, Klimek did not sign the guaranty in a personal capacity. Therefore, Lockheed Martin's related *Motion for Partial Summary Judgment Against Defendant Winfried Klimek* [Docket No. 99] should be **DENIED**. The Guarantor Defendants' *Motion for Summary Judgment* [Docket No. 93] should be

---

11. Adequate consideration did exist to support a guaranty, but this is not dispositive.

**GRANTED** as to Klimek, and otherwise **DENIED**.

### D. *galaxis USA's Negligence Counterclaim Analysis*

#### 1. *The Parties' Positions*

In its Amended Counterclaim III, galaxis USA seeks damages for negligence, claiming that Lockheed Martin negligently performed its obligations under the Production Contract. Lockheed Martin argues that the claim is barred by the economic loss rule which prohibits tort recovery for contract losses. Docket No. 95. According to Lockheed Martin, any failure on its part to perform its obligations under the Production Contract sound in contract law, not tort law. galaxis USA argues that the counterclaim is pleaded in the alternative, and in response to Lockheed Martin's position that any reverse engineering tasks were done independently of the Production Contract.

#### 2. *Analysis*

 There is no dispute that the tort claim alleged in Amended Counterclaim III is part of the BOA. This is a contract issue. The economic loss rule in Florida bars galaxis USA's negligence claim, and the counterclaim should be dismissed with prejudice. Accordingly, Lockheed Martin's Motion for Summary Judgment on Amended Counterclaim III [Docket No. 95] should be **GRANTED**.

### IV. *CONCLUSION*

For the foregoing reasons, it is

**RECOMMENDED** that Plaintiff, Lockheed Martin Corporation's ("Lockheed Martin's"), Motion for Partial Summary Judgment on Contract Liability against Defendant, galaxis USA, Ltd. ("galaxis USA"), Docket No. 96, be **DENIED**. It is

**FURTHER RECOMMENDED** that Lockheed Martin's Motion for Partial Summary Judgment against Defendant, Winfried Klimek ("Klimek"), Docket No. 99, be **DENIED**. It is

**FURTHER RECOMMENDED** that the Motion for Summary Judgment in Favor of Defendants Bavaria–Hanseatic Holding GmbH ("Bavaria–Hanseatic"), galaxis Vertriebsgesellschaft mbH ("galaxis Vertriebsgesellschaft"), and Klimek, Docket No. 93, be **GRANTED IN PART** as to Defendant, Winfried Klimek, and **DENIED IN PART** as to Defendants Bavaria–Hanseatic and galaxis Vertriebsgesellschaft. It is

**FURTHER RECOMMENDED** that Lockheed Martin's Motion for Summary Judgment on Amended Counterclaim III brought by Defendant/Counter-claimant galaxis USA, Docket No. 95, be **GRANTED**, and Amended Counterclaim III be **DISMISSED WITH PREJUDICE**.

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal. No extension of time will be granted.